## DAVIS v. JORDAN.
### No. 5731.

Court of Appeal of Louisiana.
Second Circuit.

Nov. 4, 1938.

Rehearing Denied Dec. 9, 1938.

Writ of Certiorari and Review Denied
Jan. 10, 1939.

J. B. Crow, of Shreveport, for appellant.

Dickson & Denny, of Shreveport, for appellee.

TALIAFERRO, Judge.

This suit is founded upon a check signed by defendant and drawn on the Commercial National Bank of Shreveport, allegedly of date June 10, 1933, and payable to plaintiff. He avers that the check was issued and delivered to him by defendant to evidence a loan of cash money; that the check was repeatedly presented for payment and as frequently dishonored for lack of funds to his credit in the drawee bank.

Defendant denies that he gave the check to plaintiff and denies that he is the owner or holder thereof for value or otherwise. He avers that in the year 1928 or 1929 he did prepare and sign a check for $500 on said bank in favor of Louis Bartros and, inferentially, alleges that that check is the one sued on, but avers that Bartros' name has been erased and that of plaintiff inserted instead, without defendant's knowledge or consent.

There were two trials below. The first resulted in a judgment for plaintiff, but his demands were rejected and his suit dismissed at the close of the second. This appeal is prosecuted by him.

As we view the case, a decision of the issue tendered by the pleadings and supporting testimony pivots upon questions of fact about which the sides are hopelessly at variance. The litigants are natives of Greece but have lived in the United States, home of their adoption, for many years prior to the events involved in or alleged to be involved in this suit. Unique factors enter into the case.

Plaintiff testified that defendant delivered to him the check sued on on June 10,

1933, the date it now bears, contemporaneous with the handing over to him the sum of $500 in cash as a loan; that the transaction took place in the office of the Slattery Building Hatters & Cleaners, of which plaintiff was president, in the Slattery building in the city of Shreveport, Louisiana. He also testified that in the confection of the check defendant wrote the amount thereof (Five Hundred) and his, plaintiff's name as payee, in the Greek language; that he informed defendant that the check would not clear at the drawee bank in that form and that he (plaintiff) then and there, in defendant's presence and with his consent, erased the portions of the check written in Greek and in lieu thereof wrote the equivalent in English and also inserted the date (6–10–1933) therein, thereby putting the check in its present form and language. He further testified that the money necessary to consummate the loan was taken by him from his company's funds; and that defendant assured him that he was soon expecting cash money from a kinsman living in his native land sufficient to repay the accommodation. However, he also testified that he presented the check for payment at the drawee bank within three, four or five days after delivery to him. It was returned to him with the notation that it had evidently been drawn on that bank in error. He claims to have presented the check for payment many times "nearly every week, sometimes a month or so", and that payment was declined for "insufficient funds".

Peter J. Saffron, plaintiff's business associate, also a Greek, in material respects corroborates plaintiff's version of the facts bearing upon the loan to defendant and the issuance of the check to evidence it. Saffron testified that plaintiff did make the loan from company funds and that plaintiff carried the check in his purse and very soon after the transaction was closed, on more than one occasion, exhibited it to him. He was not present when the loan was closed. He also stated that a short time before it was closed, defendant applied to him for a loan of $500 and he declined to make it.

The testimony of Clayton Cheatam to some extent supports plaintiff's contentions. Cheatam was employed by the Slattery Building Hatters & Cleaners as a "hatter" and was engaged at his bench in the performance of his duties at the time plaintiff claims to have acquired the check. Cheat-

am says that plaintiff and defendant were in the office talking and doing some writing, and that plaintiff called to him and asked him to spell "five hundred" in English and that he spelled it correctly for him. He did not witness the execution and delivery of the check and does not positively know that it was executed on the date he was asked to do the spelling but is positive that the check was very soon thereafter shown him by plaintiff. He did not scrutinize it. This witness left plaintiff's employ some three years ago. He now lives in Texas. There is nothing apparent to affect the credibility of his evidence.

Defendant's testimony supports the allegations of his answer. He denies positively that he ever borrowed any money from plaintiff and denies that he was in his company's office on June 10, 1933; in fact, denies he had seen or talked to him since 1930 or 1931, although their places of business were only three or four blocks apart.

Bartros did make defendant a loan of $500 on January 31, 1928, which has not been repaid. Defendant testified that he filled out and signed a check in Bartros' favor for $500 to evidence this loan and tendered it to him, but that he refused to accept it. Bartros admits this was done. This was over five years prior to the date of the check in question. If the check sued on is the one that defendant tendered to Bartros, its whereabouts during these years is not accounted for. Defendant intimates that it could have been left in the pocket of a garment sent to plaintiff's company for cleaning and that by this means plaintiff acquired possession of it. If this happened, it must have been in the year 1928 as it is unreasonable to think that defendant would continuously (for several years) carry the check about his body or in his clothes. If it had fallen into plaintiff's hands within a reasonable time after issuance, no good reason appears for him to have held it for over four years. What purpose could he have hoped to subserve by retaining it? What use could he have hoped to make of it? To ask these questions is to answer them.

Defendant testified and proved that he could intelligently fill out printed checks by the use of English words. Several cancelled checks offered in evidence, issued during the years 1925, 1926 and 1929, established this fact. However, he admits that he sometimes has to refer to books to

enable him to correctly spell English words. Cheatam was only asked how to spell the words "five hundred", not how to write them.

Because plaintiff contends that defendant gave him the check to evidence and secure payment of the loan made him should not arouse suspicion nor excite curiosity. It is shown that to give unconditional checks to those making loans is a common practice among the Greeks of the city of Shreveport. They are exceedingly trustful of each other and oftimes make loans to each other involving several hundred dollars without requiring any written evidence whatever thereof. At one time plaintiff loaned defendant $900 on such conditions. The use of promissory notes to evidence obligations between them seems not to have been resorted to.

Defendant, having admitted the genuineness of his signature on the check but seeking to escape liability thereon on the grounds declared upon in his answer, carried the burden of proof on the issue tendered. He has failed to meet that issue with evidence of sufficient probative weight to overcome the case made out by plaintiff. The erasures on the check have been satisfactorily explained by testimony on plaintiff's behalf. He is a holder in good faith and for value.

In brief, it is urged on behalf of defendant that the check sued on is null and void, therefore not enforceable against him because plaintiff made material alterations thereon after it was delivered to him. This contention flies into the teeth of the answer and does violence to defendant's original position. To relieve the maker or drawer of a negotiable instrument from liability thereon because the holder has materially altered it, presupposes legal existence of such instrument and rightful possession or ownership thereof by the one making or responsible for such alterations. Surely if the instrument has no legal existence or is not owned by the one making or who is responsible for such alterations, the fact that the alterations have been made is of secondary importance and has no real bearing upon the issue of the right of the holder to sue thereon. In the present case defendant contends that said check was at no time the property of plaintiff. If that were true, no amount of alterations in the check would or could affect the situation.

Plaintiff legally acquired the check in question. The changes in its structure, above discussed, were simply from one language to another. Such changes did not amount to material alterations in the sense of Section 124 of the Negotiable Instruments Law (Act No. 64 of 1904), which reads as follows: "Where a negotiable instrument is materially altered without the assent of all parties liable thereon, it is avoided, except as against a party who has himself made, authorized or assented to the alteration, and subsequent indorsers."

But, if it be conceded that said alterations were material, defendant consented thereto.

We are of the opinion that the lower court correctly passed on the issues of the case when it was first tried. Therefore, for the reasons herein assigned, the judgment appealed from is reversed, annulled and set aside; and there is now judgment in favor of the plaintiff, John P. Davis, and against the defendant, Nick Jordan, for the sum of Five Hundred ($500) Dollars, with legal interest thereon from judicial demand until paid; and for all costs of this suit.